CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
3/31/2018
JULIA C. DUDLEY, CLERK
BY: S/J.Vasquez
 DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| JAY L. MARTS and DANA NEWCOMB, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE REPUBLICAN PARTY OF ) <br> VIRGINIA, INC., and ) <br> FREDERICK COUNTY REPUBLICAN ) <br> COMMITTEE, ) <br> ) <br> Defendants. ) | Civil Action No. 5:17-cv-00022 <br><br> By: Elizabeth K. Dillon <br> United States District Judge |

**MEMORANDUM OPINION**

Plaintiffs Jay Marts and Dana Newcomb allege that defendants, the Republican Party of Virginia (RPV) and the Frederick County Republican Committee (FCRC), improperly deprived them of their right to vote in party- run nomination processes.

Defendants now move to dismiss plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Because the court concludes that it lacks jurisdiction over plaintiffs' claims, the court will grant defendants' motion and dismiss plaintiffs' complaint without prejudice.

I. BACKGROUND

The facts below come from plaintiffs' amended complaint, because the court accepts the well-pleaded, nonconclusory factual allegations in the complaint as true when ruling on a motion to dismiss. *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

RPV, a political party in Virginia, aims to "promot[e] the principles and policy objectives of the Republican Party and elect[] nominated Republican candidates to public office." (Compl. ¶ 6, Dkt. No. 25.) FCRC, located in Virginia's Tenth Congressional District, serves as a committee of RPV. (*Id.* ¶ 15.) RPV operates under a Plan of Organization (Plan), "which defines the requirements for membership, party organizational structure, the process for election of party officials, methods of nomination for candidates for public office and how party members deemed errant may be disciplined or removed." (*Id.* ¶ 7.) Article I, section (A)(2) of the Plan states that "a voter who, subsequent to making a statement of intent (in a party candidate nominating process), publicly supports a candidate in opposition to a Republican nominee shall not be qualified for participation in party actions as defined in Article I for a period of four (4) years." (Plan at 3, Dkt. No. 25-1.)[1]

On April 27, 2015, plaintiffs attended a FCRC mass meeting. At the mass meeting, plaintiffs certified their adherence to FCRC and RPV (collectively, the Party) principles and their intention to support the Party's candidates. (Compl. ¶¶ 17–18, 21, 23–34.) Subsequently, plaintiffs publicly supported independent candidates running in opposition to Party candidates. (*Id.* ¶¶ 19, 22.) Consequently, the Party took numerous steps to reprimand plaintiffs for their support of opposition candidates.

In April 2016, the Party declined to provide Marts with voting credentials at both the Republican Tenth District Convention and the 2016 RPV State Convention. (*Id.* ¶ 36.) Similarly, the Party declined to provide Newcomb with voting credentials at the Republican Tenth District Convention. (*Id.*)

---

[1] Because the Plan is a document attached to the complaint, it is appropriate for the court to consider it on a motion to dismiss. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

Additionally, in May 2016, a FCRC member brought a "challenge," alleging that plaintiffs violated Article I of the Plan. (*Id.* ¶ 37.) FCRC heard the challenge and declined to impose Article I sanctions against plaintiffs. (*Id.* ¶ 38.) On appeal, however, the Tenth District Republican Committee decided to impose Article I sanctions on plaintiffs, a decision upheld by the Republican State Central Committee. (*Id.* ¶¶ 41, 44.) Subsequently, in May 2017, the Party declined to provide Marts with voting credentials at the FCRC Mass Meeting. (*Id.* ¶ 45.) The candidates nominated at the Mass Meeting would automatically appear on the November 7, 2017 general election ballot, and Marts sought to vote in a contested nomination race for the Gainesboro District Supervisor seat. (*Id.*)

Plaintiffs do not challenge "the authority of RPV to remove official committee members who commit acts of disloyalty," (*id.* ¶ 46), or that "they may be disciplined for being errant Republicans." (Pls.' Resp. to Mot. Dismiss 7, Dkt. No. 24.) Rather, plaintiffs "contest being denied voting credentials." (Compl. ¶ 46.) In doing so, plaintiffs claim that the Party's imposition of Article I sanctions violated their First Amendment right to freedom of speech (in that Article I sanctions constitute prior restraints); their First Amendment right to association with others in furtherance of political beliefs; and their right to vote. (*See generally id.* ¶ 50.)

## II. DISCUSSION

The Party first moves to dismiss plaintiffs' complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction.[2] The Party contends that the court lacks subject-matter jurisdiction over plaintiffs' claims because "[t]he present matter is nothing more than an internal political party dispute that certainly does not involve any federal question." (Mot. Dismiss 9, Dkt. No. 20.)

---

[2] The Party also moves to dismiss plaintiffs' claims under 12(b)(6) for failure to state a claim upon which relief can be granted. Because the court finds that it lacks subject-matter jurisdiction under 12(b)(1), it does not reach the Party's 12(b)(6) arguments.

3

**A. Standard of Review**

A motion to dismiss under Rule 12(b)(1) tests the court's subject-matter jurisdiction over the plaintiffs' claim. Plaintiffs bear the burden of establishing that subject-matter jurisdiction exists. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). In deciding a Rule 12(b)(1) motion to dismiss, "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). It must, however, "view[] the alleged facts in the light most favorable to the plaintiff, similar to an evaluation pursuant to Rule 12(b)(6)." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999). Dismissal under Rule 12(b)(1) is proper "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R.R*, 945 F.2d at 768).

**B. The Court Lacks Subject Matter Jurisdiction Over the Internal Party Affairs At Issue.**

The Supreme Court and the Fourth Circuit both recognize political parties' right to associate and importantly, their right to limit that association. *See, e.g.*, *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986) ("The freedom of association protected by the First and Fourteenth Amendments includes partisan political organizations."); *id.* at 224 ("The Party's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals, is protected by the Constitution."); *Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 (1981) ("[T]he freedom to associate for the 'common advancement of political beliefs,' necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only.")

(citation omitted). Additionally, in Virginia, a party is free to select from various methods of nomination in which it can exclude voters who do not share its views—including a closed primary conducted and funded by the party. It is only when the party chooses to hold a primary operated and funded by the state that it must allow all voters to participate." *Miller v. Brown*, 503 F.3d 360, 368 (4th Cir. 2007). A political party in Virginia also possesses the power to "make it own rules and regulations . . . [and] provide for the nomination of its candidates." Va. Code Ann. § 24.2-508.

Accordingly, plaintiffs concede that "generally a political party's membership composition, discipline procedures, election of officers and operating procedures do not provide standing permitting the court to exercise jurisdiction, and therefore, do not give rise to a cause of action [under] . . . [§] 1983." (Pls.' Resp. 7.) Nevertheless, plaintiffs contend that "Virginia party run candidate nomination processes which, by statute, provide automatic access to the general election ballot contests occur through a delegation of state power." (*Id.*) Therefore, plaintiffs allege that the Party acted under color of state law in denying them the ability, and their constitutional right, to vote in such party run nomination processes. (Compl. ¶ 49.) For these reasons, plaintiffs claim that "the basis for jurisdiction of this complaint . . . is provided for in 42 U.S.C. § 1983." (*Id.* ¶ 2.)

Section 1983 "creates a private right of action to vindicate violations of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Rehberg v. Paulk*, 132 S. Ct. 1497, 1501 (2012). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "In cases construing section 1983, 'under color' of law has been

treated consistently as equivalent to the 'state action' requirement under the Fourteenth Amendment." *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 215 (4th Cir. 1993) (citation omitted).

According to the Fourth Circuit in *Haavistola*, "[t]he Supreme Court has identified three situations in which particular conduct by a private entity constitutes 'state action.'" *Id.* First, state action may occur when "there is a sufficiently close nexus between the state and the challenged action of the regulated entity such that those actions may be fairly treated as those of the state." *Id.* (quoting *Alcena v. Raine*, 692 F. Supp. 261, 267 (S.D.N.Y. 1988)). Second, state action may occur when a state "exercised coercive power or has provided such significant encouragement that the action must in law be deemed to be that of the state." *Id.* (quoting *Alcena*, 692 F. Supp. at 267). Finally, state action may occur when "the private entity has exercised powers that are traditionally the exclusive prerogative of the state." *Id.* (quoting *Alcena*, 692 F. Supp. at 267).

Plaintiffs do not identify in their briefing which of these three situations they believe is applicable here. Instead, as support for their § 1983 claim, they cite language from various Supreme Court cases to argue that "a Virginia political party run nomination process is state action." (Pls.' Resp. 13.) Plaintiffs' reliance on the cited precedent is misplaced, and other cases have made clear that state action occurs, if at all, in this context only when the party's action arises in the context of a state-funded primary or its equivalent.

First, plaintiffs cite *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), where the Court addressed a challenge to the Republican Party of Virginia's requirement that voters pay a registration fee in order to become a delegate to the state convention. In striking down the registration fee, Justice Stevens stated that "[m]ajor parties have no inherent right to decide who

may appear on the ballot. That is a privilege conferred by Virginia law, not natural law. If the Party chooses to avail itself of this delegated power over the electoral process, it necessarily becomes subject to the regulation." *Morse*, 517 U.S. at 198. Plaintiffs seize on Justice Stevens's quoted language to assert that any process that selects the candidates who will appear on a general election ballot constitutes state action. (Pls.' Resp. 15–16.) However, this court notes that *Morse* was a plurality decision,[3] and Justice Breyer's concurring opinion did not declare that all party nomination processes constitute state action. *See Morse*, 517 U.S. at 238 (Breyer, J., concurring) ("We need not go further in determining when party activities are, in effect, substitutes for state nominating primaries because the case before us involves a nominating convention that resembles a primary about as closely as one could imagine."). Accordingly, Justice Stevens's statements regarding the state's ability to regulate political parties constitute dicta, not binding precedent.

Next, plaintiffs quote *Smith v. Allwright*, 321 U.S. 649 (1944):

> The privilege of membership in a party may be . . . no concern of a state. But when, as here, that privilege is also the essential qualification for voting in a primary to select nominees for a general election, the state makes the action of the party the action of the state.

(Pls.' Resp. 7 (quoting *Smith*, 321 U.S. at 664–65).)

In *Smith*, the Court reviewed a district court's ruling denying relief to an African-American man prohibited from voting in a Texas primary election. *Smith*, 321 U.S. at 650–52. The Court noted that Texas law provided that "every person, if certain other requirements are met which are not here in issue, qualified by residence in the district or county 'shall be deemed

---

[3] *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)).

7

a qualified elector.'" *Id.* at 652–53 (citation omitted). Nevertheless, in 1932, the Texas Democratic Party (Democratic Party) passed a resolution restricting its membership to "white citizens of the State of Texas." *Id.* at 668. Acting pursuant to this resolution, the Democratic Party denied Lonnie Smith, an African-American, the ability to participate in the "primary election of July 27, 1940, for the nomination of Democratic candidates for the United States Senate and House of Representatives, and Governor and other state officers." *Id.* at 651. Subsequently, Smith brought suit, alleging that defendants, who were precinct election and associate election judges, denied him the ability to participate in the primary election solely because of his race. *Id.* at 650–51.

In evaluating Smith's claim, the Court sought to determine whether the Democratic Party's treatment of Smith constituted state action. The Court noted that "[t]he Fourteenth Amendment forbids a state from making or enforcing any law which abridges the privileges or immunities of citizens of the United States and the Fifteenth Amendment specifically interdicts any denial or abridgement by a state of the right of citizens to vote on account of color." *Id.* at 657. But the Democratic Party asserted that "the Amendments are applicable only to general elections where governmental officers are actually elected. Primaries . . . are political party affairs, handled by party not governmental officers." *Id.* Accordingly, the Democratic Party claimed that it "[was] free to select its own membership and limit to whites participation in the party primary." *Id.*

As to whether primary elections constitute state action, the Court asserted that "state delegation to a party of the power to fix the qualifications of primary elections is delegation of a state function that may make the party's action the action of the state." *Id.* at 660. Because in Texas, "[p]rimary elections are conducted by the party under state statutory authority," *id.* at 663,

the Court declared that any discrimination that occurs in relation to the primary becomes state action. *See id.* at 664 ("If the state requires a certain electoral procedure . . . it endorses, adopts and enforces the discrimination against Negroes, practiced by a party entrusted by Texas law with the determination of the qualifications of participants in the primary."). The Democratic Party's discrimination against Smith stemmed from the resolution limiting party membership to "white citizens." Therefore, the Court concluded that "when, as here, th[e] privilege [of membership in a party] is also the essential qualification for voting in a primary to select nominees for a general election, the state makes the action of the party the action of the state." *Id.* at 664–65.

While emphasizing the importance of a political party's freedom of association by exercising its right to exclude, especially in the are of selecting a party's nominee, the Supreme Court revisited and clarified the reach of *Smith* in *California Democratic Party v. Jones*, 530 U.S. 567 (2000). There, the Court stated that *Smith*

> held only that, when a State prescribes an election process that gives a special role to political parties . . . the parties' discriminatory action becomes state action under the Fifth Amendment. . . . [It] do[es] not stand for the proposition that party affairs are public affairs, free of First Amendment protections— and our later holdings make that entirely clear.

*Jones*, 530 U.S. at 573.

Further, the *Jones* Court stated that *Smith* does not completely bar political parties from limiting who may participate in party primaries. Rather, *Smith* "simply prevent[s] exclusion that violates some independent constitutional proscription." *Id.* at 573 n.5.

Finally, plaintiffs rely on *Nixon v. Condon*, 286 U.S. 73 (1932), another case involving a Texas Democratic Party's resolution denying African-Americans the ability to vote in a primary election. In *Nixon*, the State Executive Committee of the Democratic Party passed a resolution

9

limiting participation in upcoming primary elections to qualified "white democrats." *Nixon*, 286 U.S. at 82. Subsequently, election judges "declined to furnish the ballot or permit the vote [of plaintiff] on the ground that the petitioner was a negro." *Id.* Consequently, plaintiff sued defendants, the primary election judges, for damages. *Id.* The district court dismissed plaintiff's claim, and the Court of Appeals for the Fifth Circuit affirmed. *Id.* at 82–83.

In evaluating plaintiff's claim, the Court focused on a Texas statute stating that "every political party . . . *through its State Executive Committee* . . . shall have the power to prescribe the qualifications of its own members." *Id.* at 82 (emphasis added). The Court interpreted the statute as Texas vesting Executive Committees with the "power to prescribe the qualifications of its own members." *Id.* at 84–85. Therefore, the Court found that "[w]hatever power of exclusion has been exercised by the members of the committee has come to them . . . not as the delegates of the party, but as the delegates of the state." *Id.* at 85. Accordingly, the Court reversed and remanded the district court's dismissal of plaintiff's claim.

However, the *Nixon* Court limited its holding:

> Whatever our conclusion might be if the statute had remitted to the party the untrammeled power to prescribe the qualifications of its members, nothing of the kind was done. Instead, the statute lodged the power in a committee, which excluded the petitioner and others of his race, not by virtue of any authority delegated by the party, but by virtue of an authority originating or supposed to originate in the mandate of the law.

*Id.* at 84.

Additionally, the Court later revisited both *Nixon* and *Smith* in *Flagg Bros, Inc. v. Brooks*, 436 U.S. 149 (1978). In discussing the *Nixon* and *Smith* line of cases, the *Brooks* Court stated that "their scope is carefully defined." *Brooks*, 436 U.S. at 158. Further, the *Brooks* Court provided that *Nixon* and *Smith* "do[] not reach to all forms of private political activity, but

encompass only state-regulated elections or elections conducted by organizations which in practice produce 'the uncontested choice of public officials.'" *Id.* (citation omitted).

In sum, plaintiffs rely on the previously discussed Supreme Court precedent to argue that party officials, acting under color of state law, deprived plaintiffs of their constitutional rights, including the right to vote. However, the court reads these cases to convey that party officials may, under limited circumstances, act under color of state law when conducting a state-regulated primary election or its equivalent. *See, e.g.*, *Banchy v. Republican Party of Hamilton Cty.*, 898 F.2d 1192, 1196 (6th Cir. 1990) ("The primary election cases do not hold that a political party is part of the state, or that any action by a political party other than conducting an election is state action. . . . The primary election cases merely hold that conducting an election is a governmental function and constitutes state action, no matter who actually conducts the election." (quoting *Cal. Republican Party v. Mercier*, 652 F. Supp. 928, 934 (C.D. Cal. 1986))).

And, as explained by *Jones*, the early primary election cases, such as *Smith*, involved the violation of "some independent constitutional proscription," *id.* at 573 n.5, most notably racially-based restrictions. The facts here do not involve a race-based restriction or limitation. Aside from the two cases dealing with Jim Crow-era laws, plaintiffs have not cited a single case where a party's disciplinary limitation on participation in its internal elections has been determined to be state action.

Significantly, moreover, the Party's challenged action here did not occur in the course of operating a state-regulated primary or its equivalent. Rather, the Party took general measures to discipline plaintiffs for their disloyalty to the party, something plaintiffs concede the Party may do.[4] Perhaps, *if* the Party here were to interpret and apply its own discipline to preclude plaintiffs

---

[4] Indeed, not only did plaintiffs concede at argument that the Party has the right to impose discipline, they made other concessions that greatly undermined their claim, as well. For example, counsel stated that if the

11

from participating in an *open* primary conducted and funded by the state, that would be a sufficient allegation of state action.[5] But the plaintiffs have not alleged that they have been prevented from voting in any state-run primary, that the Party has attempted to prevent the plaintiffs from doing so, or that the discipline imposed plausibly includes such a prohibition.[6] In the absence of any plausible contention that defendants have prevented, or are likely to seek to prevent plaintiffs from voting in a state-run primary, plaintiffs have not plausibly alleged state action.

In short, in order for the Party's action to constitute state action, it would need, at least, to prohibit plaintiffs from voting in a state-regulated primary or its equivalent. This simply has not occurred here.

III. CONCLUSION

For all of these reasons, the court concludes that plaintiffs have not alleged any state action by the Party. In the absence of any state action, there is no viable federal claim to confer jurisdiction on this court. Accordingly, the court will grant the motion to dismiss and will

---

discipline had been imposed for only a shorter period of time, instead of four years, no constitutional violation would have occurred. He also stated that it would be permissible for Virginia's General Assembly to give authority to a political party to prohibit persons like plaintiffs from voting.

[5] Virginia law allows a political party to select its candidates through various mechanisms other than open primaries. *Miller*, 503 F.3d at 362 (noting that while an open primary "is conducted and funded by the state," methods other than a primary "are conducted and funded by the party," including "a party convention . . .; a mass meeting, also known as a 'caucus'; and a party canvass or unassembled caucus, also called a 'firehouse primary'").

[6] The sanctions imposed bar plaintiffs' "participation in party actions as defined in Article I for a period of four (4) years." (Dkt. No. 25-1, at 3.) And although "party actions" consist of "mass meetings, party canvasses, conventions, *or primaries*," (*id.* (emphasis added)), there is no allegation that the "primary" would also include a *state-run* primary. Furthermore, the Plan defines "primary" as "subject to the Election Laws of the Commonwealth of Virginia." (Plan at 5, Dkt. No. 25–1.) Under the Election Laws of Virginia, any otherwise qualified voter may vote in a state-regulated "general, primary, and special election." Va. Code Ann. §§ 24.2-101, 530. Accordingly, the Plan, by defining "primaries" by reference to state election laws, effectively acknowledges that those laws would trump any party discipline.

dismiss the case without prejudice for lack of jurisdiction.

An appropriate order will be entered.

Entered: March 31, 2018.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge